**Kevin WRIGHT, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

**No. 97–6255.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 26, 1998.

Decided and Filed June 28, 1999.

Kevin Wright, White Deer, PA, Petitioner–Appellant pro se.

Kevin M. Schad (argued and briefed), Schad, Buda, Lucia & Cook, Cincinnati, Ohio, for Appellant.

Robert Anderson (argued and briefed), Office of the U.S. Attorney, Nashville, Tennessee, for Appellee.

Before: JONES and COLE, Circuit Judges; O'MALLEY, District Judge.[*]

---

[*] The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

NATHANIEL R. JONES, Circuit Judge.

In 1992, a jury convicted petitioner-appellant Kevin Wright of conspiring to distribute cocaine base; distributing and possessing cocaine base with intent to distribute; using or carrying a firearm during and in relation to a drug trafficking crime; and aiding and abetting the commission of the aforementioned crimes. Wright was subsequently sentenced to 535 months of imprisonment, and we affirmed his conviction and sentence on appeal. *See United States v. Wright,* 16 F.3d 1429 (6th Cir.1994). Wright thereafter filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255, and now appeals from the district court's order denying in part that motion. For the reasons stated herein, we **AFFIRM.**

**I.**

On March 4, 1992, a federal grand jury for the Middle District of Tennessee returned a Superseding Indictment charging Wright with the following: conspiring to knowingly and intentionally distribute cocaine base from July 25, 1991 to August 23, 1991, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); knowingly and intentionally distributing, or possessing with intent to distribute cocaine base from July 27, 1991 to July 31, 1991, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); using or carrying a firearm during and in relation to a drug trafficking crime from July 27, 1991 to July 31, 1991, in violation of 18 U.S.C. §§ 924(c) and 2 (Count 3); knowingly and intentionally possessing with intent to dis-

tribute cocaine base on August 23, 1991, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 4); and using or carrying a firearm during and in relation to a drug trafficking crime on August 23, 1991, in violation of 18 U.S.C. §§ 924(c) and 2 (Count 5). The Superseding Indictment also named Aaron Bray, Rosco Kidd, Jr., David McWhorter, Dwight Gober and Samson Wright as co-conspirators.

Wright proceeded to a jury trial, at which several of his co-defendants and various other individuals testified to his involvement in the dealing, selling and distribution of crack cocaine.[1] Specifically, Connie Daniels, who lived in an apartment in a Clarksville, Tennessee housing project, testified that during July 1991 she allowed Wright and his co-conspirators to use her apartment to deal and sell crack cocaine. She further testified that she then saw three of Wright's co-conspirators in possession of various weapons.[2] Although she testified to seeing Wright handle crack cocaine on several occasions, she did not state that he possessed any weapons during July 1991. Daniels's testimony was corroborated by Anita Watkins, who went to Daniels's apartment during that time period to purchase crack cocaine.[3] Watkins also testified that she saw Wright and two or three other individuals in the back bedroom of Daniels's apartment "cutting" crack cocaine. She further stated that one of the individuals came out of the back room, into the living room, with a gun. At no point in her testimony, however, did Watkins state that she specifically saw Wright using or carrying any weapons during July 1991.[4] Similarly, Michael

---

1. Only the facts specifically related to the charges at issue in Wright's § 2255 motion are discussed here. The details of the investigation and arrest of Wright and his co-conspirators are more fully set forth in Wright's direct appeal. *See Wright,* 16 F.3d at 1431–33.

2. Daniels specifically testified that these three individuals "would always have the guns to where you could see them and notice them.

You would always know that they had these guns." J.A. at 351.

3. Watkins also testified that she has seen crack cocaine being made, described the process and identified two government exhibits as crack cocaine.

4. At trial, Watkins and other witnesses also testified regarding Wright's alleged June 1991 conduct. Specifically, various witnesses testified to seeing Wright handle and sell crack

Fields testified that Wright hired him in June of 1991 to work as a "runner."[5] Fields further testified that on three days in July, he went to Daniels's apartment to pick up crack cocaine from Wright to sell. Fields also stated that he saw several individuals with weapons at Daniels's home. Specifically, Fields stated that when he went to Daniels's apartment, he would go to the back room and knock on the door. The person at the door would then "open the door [with] a gun in his hand." J.A. at 369. Fields further identified a gun at trial as similar to one of the weapons Wright and his co-conspirators had in the back room of Daniels's apartment. According to Fields, the gun was, at the most, three feet away from the crack cocaine. Moreover, Fields testified that on July 31, 1991, four individuals, but apparently not Wright, exchanged gunfire with a drug customer.

The jury also heard from Dwight Gober, who testified that in order to obtain money to pay his college tuition, he agreed to accompany Wright to Clarksville to sell crack cocaine. Gober specifically testified regarding Wright's involvement in the crack cocaine operation during August 1991. Finally, Aaron Bray testified that during July 1991, he and other co-conspirators, including Wright, distributed crack cocaine from Daniels's apartment. Bray and other co-conspirators carried the weapons, while Wright handled the crack cocaine in the back room. Bray also stated that he "worked the door" at Daniels's apartment, and provided protection for the drug activities that occurred in the back room of the apartment. J.A. at 342. He stated that although no one specifically told him to provide such protection, he knew or understood that this was his role from his past experiences in drug operations. Bray also testified that on July 29, 1991, he, Wright and other co-conspirators had three firearms in a "pink gym bag."[6]

In 1992, a jury convicted Wright on all five counts, and Wright was subsequently sentenced to 535 months of imprisonment.[7] On appeal, this court affirmed his conviction and sentence. Wright, 16 F.3d at 1431. On November 4, 1996, Wright filed in the district court a § 2255 motion to vacate his sentence, alleging, among other things, that: 1) insufficient evidence existed to support his two § 924(c) convictions in light of Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); 2) his appellate counsel rendered ineffective assistance by failing to challenge the quantity of drugs used to determine his relevant conduct and his sentencing enhancement for a leadership role in the offense; and 3) the government failed to prove that he distributed crack cocaine, as opposed to another form of cocaine

---

cocaine and use or carry firearms in June. Although Wright was not indicted for this conduct, we concluded in his direct appeal that such testimony was admissible to show Wright's intent to distribute cocaine in July and August, and to establish his plan to participate in the conspiracy. Wright, 16 F.3d at 1442. In the instant appeal, the government does not contend that Wright's alleged June 1991 conduct establishes that he committed the July and August § 924(c) violations set forth in the indictment. Instead, the government merely points out that such testimony helps establish that firearm use "was an integral part of the 'joint effort or enterprise' in July 1991." Gov't Br. at 7 n. 5.

5. According to Fields, a "runner" takes the drugs to the buyer and brings the money to the dealer.

6. Bray stated that the firearms were unloaded, and that the "clips" were in the glove compartment. Bray was then asked "[w]ho had the pink bag or the owner of the pink bag," to which he responded "Mr. Wright. Kevin Wright." Thus, it is unclear whether Wright actually carried or possessed the gym bag, or whether Wright was simply the owner of the bag. Bray also stated that he did not know to whom the firearms belonged. J.A. at 669.

7. The total imprisonment time was determined as follows: 235 months for Counts 1, 2 and 4, served concurrently; 60 months for Count 3, served consecutive to the sentence imposed for Counts 1, 2 and 4; and 240 months for Count 5, served consecutive to the sentence imposed for Count 3.

base, for sentencing purposes. The district court granted in part and denied in part Wright's motion. The court concluded that there was insufficient evidence to support Wright's § 924(c) conviction charged in Count 5. The district court therefore vacated Wright's conviction on that count, and resentenced him to 295 months of imprisonment. However, the district court denied Wright's remaining claims. Wright thereafter filed this timely appeal.

## II.

■ In order to prevail on his § 2255 motion, Wright "must show a fundamental defect in his sentencing which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Nagi v. United States,* 90 F.3d 130, 133–34 (6th Cir.1996)(internal quotations and citations omitted); *see also Schledwitz v. United States,* 169 F.3d 1003, 1011 (6th Cir.1999)("To prevail under § 2255, a defendant must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or jury's verdict.")(citing *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). In reviewing the denial of a § 2255 petition, we review the district court's legal conclusions de novo, and its factual findings for clear error. *Rattigan v. United States,* 151 F.3d 551, 554 (6th Cir.1998).

## III.

### A. Section 924(c)(1) Conviction

On appeal, Wright argues that in light of *Bailey,* the district court erred in determining that the government established that he used or carried a firearm in violation of 18 U.S.C. §§ 924 and 2. An individual violates § 924 when he or she uses or carries a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). In addition, § 2 of that chapter provides that:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the Unites States, is punishable as a principal.

18 U.S.C. § 2.

■ In *Bailey,* the Supreme Court explained what conduct constitutes "use" under § 924. The Court determined that in order to show "use" for purposes of establishing a § 924 violation, the government must show that "the defendant actively employed the firearm during and in relation to the predicate crime." *Bailey,* 516 U.S. at 150, 116 S.Ct. 501 (finding that the defendant did not "use" the firearm where it was found, unloaded, in a footlocker in a closet). Such "active employment" includes "brandishing, displaying, bartering, striking with, and ... firing or attempting to fire a firearm." *Id.* at 148, 116 S.Ct. 501. Although the Court in *Bailey* found it unnecessary to specifically articulate standards for what constitutes "carry" under § 924, the Court did note that an offender "carries" a firearm when he "keeps a gun hidden in his clothing throughout a drug transaction." *Id.* at 146, 116 S.Ct. 501. In addition, the Court distinguished "use" from "carry" and went on to note that "[a] defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession." *Id.* at 149, 116 S.Ct. 501. This court, in *United States v. Riascos–Suarez,* 73 F.3d 616 (6th Cir. 1996), further elaborated on the carry prong and held that "in order for a defendant to be convicted of carrying a gun in violation of section 924(c)(1), the firearm must be immediately available for use-on the defendant or within his or her reach. Such availability takes the weapon beyond simple possession or storage." *Id.* at 623.

In order to establish that the firearm was carried "in relation to" a drug trafficking offense, the government must prove that the firearm "furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence." *Id.* (citing *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). Further elaborating on the *Riascos–Suarez* definition of "carry," we noted in *United States v. Moore,* 76 F.3d 111 (6th Cir.1996), as follows:

> Although the immediate availability of the gun to the [defendant] was a key factor in *Riascos–Suarez,* we do not read that case as identifying availability as the *only* relevant consideration; if Congress had meant section 924(c)(1) to implicate any individual who happens to be within arm's reach of a firearm, surely it would have selected a more accurate term than "carry." A definition of "carry" that takes only availability into account ignores the term's most obvious connotation, *i.e.,* physical transportation. Immediate availability is therefore a necessary, but not sufficient, determinant.... The [defendant] in *Riascos–Suarez* "carried" the firearm not only because he had it within reach, but also because he physically brought it with him in the course of his drug trade.

*Id.* at 113 (footnote and internal citations omitted; emphasis in original); *see also Hilliard v. United States,* 157 F.3d 444, 449 (6th Cir.1998)(we must "consider accessibility in addition to one's physical transportation of his weapon" in determining whether a defendant carried a firearm).

▪ We find that based on the evidence presented at trial, and the standards articulated in *Bailey, Riascos–Suarez* and *Moore,* Wright did not personally "use" or "carry" a firearm in violation of § 924(c). The evidence does not establish that Wright used any firearm in July 1991, because no witness testified to specifically seeing Wright actively employ (*i.e.,* brandish, display, barter, strike with, fire or attempt to fire) the firearm during July 27, 1991 to July 31, 1991, the period charged in Count 3. Further, the evidence is insufficient to establish that Wright carried any firearm on his person; that any firearm was "within [his] reach and immediately available for use" during that period, *see Riascos–Suarez,* 73 F.3d at 623; or that he "physically brought [a firearm] with him in the course of his drug trade," *see Moore,* 76 F.3d at 113.

▪ We do not end our inquiry here, however, because Count 3 also charged Wright with aiding and abetting pursuant to 18 U.S.C. § 2. Thus, Wright can be convicted of using or carrying a firearm, even though he never personally used or carried any weapon during the period charged in the indictment. *See Rattigan,* 151 F.3d at 557 (defendant may be convicted of aiding and abetting a § 924(c) violation even if the defendant "never had actual possession of a firearm during the course of committing the crime")(citing *United States v. Jones,* 102 F.3d 804 (6th Cir.1996)); *United States v. Lowery,* 60 F.3d 1199 (6th Cir.1995); *Torres v. United States,* No. 96–3424, 1997 WL 243422, at *1 (6th Cir.1997)(noting that such a conviction is no more unusual than similarly convicting a defendant for possession of drugs he never touched); *United States v. Giraldo,* 80 F.3d 667, 676 (2d Cir.1996) (holding that if, during the predicate transaction, a firearm was carried by or within defendant A's reach, but not defendant B's, defendant B can be held liable for aiding and abetting provided that defendant B has knowledge of the proposed crime and "performed some affirmative act relating to that firearm"). Although *Bailey* and *Riascos–Suarez* narrowed and clarified what actions constitute using or carrying a firearm under § 924(c), those cases did not affect aiding and abetting theories. *See United States v. Myers,* 102 F.3d 227 (6th Cir.1996); *Grant v. United States,* No. 96–1958, 1998 WL 808240, at *2 (6th Cir.1998)(per curiam)("courts agree that *Bailey* did not limit, narrow, or other-

wise change the aiding and abetting theory of criminal liability under § 924(c)")(collecting cases). Thus, pursuant to well-established case law in this circuit, Wright is criminally liable under § 924(c) as an aider and abettor if the government establishes that he "as the accomplice, associated and participated in the use of the firearm in connection with the underlying drug crime." *Rattigan,* 151 F.3d at 558; *United States v. Morrow,* 977 F.2d 222, 231 (6th Cir.1992)(*en banc*)(same). In *Rattigan,* we expanded on the government's burden in establishing aider and abettor liability under § 2. Specifically, we concluded that

> [t]he government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him. This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.

*Rattigan,* 151 F.3d at 558 (internal citation omitted). Thus, in essence, the government must establish more than that the defendant knew one of his co-conspirators carried a firearm; instead, "there must also be proof that the defendant performed some affirmative act relating to that firearm." *Giraldo,* 80 F.3d at 676; *see also Rattigan,* 151 F.3d at 558.

There is ample evidence in the record that some of Wright's co-conspirators were armed and guarding the door to Daniels's apartment, and that, on one occasion, these individuals even exchanged gunfire with a disgruntled drug customer. Thus, we easily conclude that some of Wright's co-conspirators carried firearms in violation of § 924(c) during July 27, 1991 to July 31, 1991. *See, e.g., Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 1915, 141 L.Ed.2d 111 (1998)("[n]o one doubts that one who bears arms on his person 'carries a weapon' "). Thus, the only issue

we need consider here is whether the government presented evidence sufficient to prove that Wright aided and abetted his co-conspirators in using or carrying a firearm in relation to a drug trafficking crime.

After reviewing the record, we are satisfied that the government established that Wright engaged in acts indicating that he knew his co-conspirators were armed, and that he acted "with the intent to assist or influence the commission of the underlying predicate crime." *See Rattigan,* 151 F.3d at 558. Witnesses testified to hearing and/or seeing an armed "shoot out," and to the presence of armed individuals guarding the door to Daniels's apartment. Based on this evidence, a reasonable, properly instructed jury could infer that Wright knew his co-conspirators were armed. As to the second requirement, *i.e.,* that Wright acted with the intent to assist or influence his co-conspirators, our decision in *Rattigan* provides substantial guidance. In *Rattigan,* there was also substantial witness testimony regarding the defendant's involvement in narcotics trafficking. Further, although the government's witness saw another individual involved in the drug trafficking ring use a firearm during several drug transactions, the witness never saw the defendant with a weapon. *Id.* at 553. The *Rattigan* court first determined that although there was no evidence that the defendant actually used a weapon, he could still be convicted of aiding or abetting. The court went on to conclude that: 1) it was "highly unlikely" that the armed co-conspirator's "presence during the drug transactions was merely coincidental"; 2) due to the "repetitive nature" of the drug transaction, the defendant knew that the weapon was being used and "benefitted from its presence for protection"; and 3) had the defendant not been dealing drugs, the armed co-conspirator would have no use for the weapon. *Id.* at 558. Similarly, in *Grant,* we concluded that "the fact that [a coconspirator] brandished and/or displayed the gun in [defendant's] presence while [defendant] con-

ducted the drug transaction is sufficient to establish that [defendant] 'associated and participated in the use of the firearm in connection with the underlying crime.'" *Grant,* 1998 WL 808240, at * 3.

Our conclusions in *Rattigan* and *Grant* are equally applicable to the case *sub judice.* Several witnesses, including Wright's co-conspirators, testified to seeing members of the drug conspiracy use or carry weapons, in relation to the drug trafficking activity, on several occasions. Further, Bray, weapon in hand, was in Daniels's home during the drug activities and served as a lookout and protector for the drugs and the drug operation. In addition, a firearm was in the back room, a few feet from the drug activity. Neither Bray's actions, nor the presence of the firearm near the drug activities, was a mere coincidence. Although Wright argues to the contrary, we agree with the district court's conclusion that although Wright primarily "cut" the cocaine in the back room of Daniels's apartment, leaving protection of the drug operation to co-conspirators, "this division of labor does not eliminate Mr. Wright's liability for using a firearm under the principles of aiding and abetting." J.A. at 317; *see Bazemore v. United States,* 138 F.3d 947, 949 (11th Cir.1998)(defendant aided and abetted § 924(c) violation where he "knowingly accepted the gun's protection while he was inspecting the [drugs]"). Based on the evidence presented, the district court correctly concluded that Wright aided or abetted his co-conspirators in using or carrying firearms, in relation to drug trafficking activities, in violation of 18 U.S.C. §§ 924(c) and 2. Thus, the district court properly denied Wright's motion in this regard.

**B.   Ineffective Assistance of Counsel**

■ Wright next argues that his appellate counsel rendered ineffective assistance on his direct appeal. Specifically, Wright contends that counsel was ineffective because he did not challenge Wright's sentence enhancement under U.S.S.G. § 3B1.1(a) [8] for a leadership role in the offense, nor did he challenge the quantity of crack cocaine utilized to determine Wright's relevant conduct under U.S.S.G. § 2D1.1(c)(3).[9] In order to establish that counsel was ineffective, Wright must show that counsel's performance was deficient and that this deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Gravley v. Mills,* 87 F.3d 779, 785 (6th Cir.1996)(requiring a showing that counsel's conduct "was not within a 'wide range of reasonable professional assistance' and that but for counsel's performance, the result probably would have been different")(quoting *Strickland,* 466 U.S. at 689, 694, 104 S.Ct. 2052). Appellate counsel is not ineffective simply because he or she decides not to raise every possible argument on appeal. *See Jones v. Barnes,* 463 U.S. 745, 753, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)("A brief that raises every colorable issue runs the risk of burying good arguments[.]").

■ A sentencing court may properly enhance a defendant's sentence under § 3B1.1(a) provided that the conspiracy involved five or more participants, and the defendant led or organized at least one of those participants. *See United States v. Bingham,* 81 F.3d 617, 629 (6th Cir.1996); U.S.S.G. § 3B1.1(a) & cmt. n. 2. In determining whether to enhance a defendant's sentence pursuant to this section, a district court should consider such factors as the exercise of decisionmaking authority, the

---

8.   This section, "Aggravating Role," provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." U.S.S.G. § 3B1.1(a)(emphasis in original).

9.   Section 2D.1.1(c)(3) provides a Base Offense Level of 34 if the defendant was responsible for "[a]t least 150 [grams] but less than 500 [grams] of Cocaine Base[.]"

nature of the defendant's participation in the commission of the offense, the recruitment of accomplices, the degree of participation in planning or organizing the offense, and the degree of control exercised over others. U.S.S.G. § 3B1.1 cmt. n. 4. Wright seizes on the "control" factor in his brief, and argues that there was no evidence that he controlled the actions of any of his co-conspirators. This argument is without merit. There was ample evidence that Wright recruited Fields and others to serve as "runners" and sell crack cocaine, participated in the drug conspiracy by preparing the crack cocaine, secured a location from which the drugs could be sold, and handled the drug proceeds. Consequently, there was more than sufficient evidence to establish Wright's leadership role in the conspiracy, and thus, Wright's counsel was clearly not ineffective for failing to challenge the § 3B1.1 enhancement.

■■■ Similarly, Wright's counsel was not ineffective for failing to challenge the quantity of drugs used to determine Wright's base offense level. Under the guidelines, the relevant sentencing conduct for a "jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]" U.S.S.G. § 1B1.3(a)(1)(B). In determining whether an individual defendant is responsible for the conduct of others, "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." Id. at cmt. n. 2. Because this provision is more narrow than the conduct under the law of conspiracy, however, "a sentencing judge may not, without further findings, simply sentence a defendant according to the amount of narcotics involved in the conspiracy." United States v. Tucker, 90 F.3d 1135, 1144 (6th Cir. 1996). Instead, the government must

prove scope and foreseeability by a preponderance of the evidence. Id.

At the time of Wright's arrest on August 23, 1991, 23.7 grams of crack cocaine were found on his person, and an additional 203.4 grams were found in the pink gym bag in the car in which he was traveling, resulting in a total sentencing weight of 227.1 grams. Wright's co-conspirators testified that they traveled with Wright to Clarksville specifically to distribute crack cocaine. Thus, there was ample evidence to support the district court's findings that because the possession of the drugs was foreseeable, and because this possession was committed in furtherance of the jointly undertaken criminal activity, the entire 227.1 grams was properly attributable to Wright. Accordingly, we find that Wright has not satisfied the standard articulated in Strickland, and thus, the district court properly denied his ineffective assistance of counsel claim.

## C. Determination of the Type of Drug Involved

■■■ Wright's final argument is that the government failed to prove that the substance which he was charged with possessing and distributing was crack cocaine, as opposed to some other form of cocaine base. Wright made a similar argument on his direct appeal, which we rejected, concluding that "there was sufficient evidence for the jury to determine that the substance in question was crack cocaine." Wright, 16 F.3d at 1440. Absent exceptional circumstances, or an intervening change in the case law, Wright may not use his § 2255 petition to relitigate this issue. See Oliver v. United States, 90 F.3d 177, 180 (6th Cir.1996); DuPont v. United States, 76 F.3d 108, 110–11 (6th Cir.1996).

■■■ In the instant appeal, Wright contends that United States v. James, 78 F.3d 851 (3d Cir.1996), and United States v. Adams, 125 F.3d 586 (7th Cir.1997), both decided after his direct appeal, establish that the district court erred in concluding that the substance was crack co-

caine, and thus, "[r]ules of fundamental fairness" require a new sentencing proceeding. Wright's Br. at 13.[10] Wright is correct that the government has the burden of proving, by a preponderance of the evidence, the type of drug which he was charged with distributing. *See United States v. Jones,* 159 F.3d 969, 981–82 (6th Cir.1998); *Adams,* 125 F.3d at 590. We further agree with Wright that the government's ability to specifically prove that he distributed crack cocaine is particularly important in light of the enhanced penalties associated with such distribution. *See Adams,* 125 F.3d at 590 (the "severe difference in punishment" of crack cocaine versus powder cocaine offenses "deserves great care in application").

Unlike *James* and *Adams,* both of which involved plea agreements, the record in Wright's case is replete with testimony that Wright and other members of the conspiracy distributed crack cocaine. For example, although the government was unable to recover the drug forming the basis of the July 1991 conduct and submit it for scientific analysis, the government did submit for testing the 227.1 grams of cocaine base seized during Wright's August 1991 arrest. At trial, a chemist with the Tennessee Bureau of Investigation crime laboratory, Helen Diane Miller–Smith, testified that she performed several different scientific tests on the substance seized and determined that it contained cocaine base. She further testified that the substance was a "chunky hard substance … indicative of the processes used [in] making cocaine base." J.A. at 42. Miller–Smith's testimony substantially assists the government in meeting its burden. *See United States v. Gold,* No. 97–5669, 1998 WL 708732, at *4 (6th Cir.1998)(per curiam)(noting that the government met its burden where it presented testimony of a forensic chemist that the substance seized was cocaine base); *see also United States v. Finch,* No. 95–1496, 1996 WL 494992, *2 (6th Cir.1996)(per curiam)(holding that the Guidelines' reference to the "street name" of the substance (*i.e.,* "crack") and the sentencing court's finding that it was "dealing with a hard rocklike substance which … fi[t] the description of crack cocaine" was a sufficient basis to uphold defendant's sentence). In addition to Miller–Smith's testimony, Bray and Fields, Wright's co-conspirators, testified that the substance being distributed was crack cocaine and consistently referred to that substance as crack cocaine. *Wright,* 16 F.3d at 1439–40. Further, Watkins and Daniels testified that the drug was crack cocaine based on their personal purchases and use of crack cocaine. In Wright's direct appeal, we concluded that the witnesses' testimony was "circumstantial evidence which established that the cocaine base forming the basis of the July 1991 conduct was crack cocaine." *Id.* at 1439. We find that based on the chemist's testimony and the

10. We note that the defendants in both *James* and *Adams* were sentenced under the 1993 versions of the Guidelines. The 1993 Amendment to U.S.S.G. § 2D1.1(c)("Amendment 487") specifically required the government to prove at sentencing that the defendant distributed crack cocaine as opposed to some other form of cocaine base. Pursuant to Amendment 487, "forms of cocaine base other than crack (*e.g.,* coca paste, an intermediate step in the processing of coca leaves into cocaine hydrochloride, scientifically is a form of cocaine, but it is not crack) will be treated as cocaine." 1993 U.S.S.G. Amend. 487. Amendment 487 also specifically defines "cocaine base" as "crack," the "street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1, Notes to Drug Quantity Table n.(D). However, Wright was sentenced under the 1991 edition of the Guidelines, which did not define "cocaine base." We apply the Guidelines in effect on January 11, 1993, the date Wright was sentenced, unless the Guidelines specify that a particular amendment is to apply retroactively. *See* U.S.S.G. § 1B1.11; *United States v. Gort–DiDonato,* 109 F.3d 318, 322 n. 4 (6th Cir.1997). The Guidelines do not specify that Amendment 487 is to apply retroactively. *See* U.S.S.G. § 1B1.10; *United States v. Booker,* 70 F.3d 488, 490 (7th Cir.1995). Thus, the government was required to prove only that the substance was cocaine base.

lay witness testimony of Wright's co-conspirators, the government proved by a preponderance of the evidence that the substance for which Wright was charged was crack cocaine.[11]

## IV.

For the reasons stated herein, the district court did not err in (1) determining that there was sufficient evidence to support Wright's §§ 924(c)(1) and 2 convictions as charged in Count 3 of the indictment; (2) rejecting Wright's ineffective assistance of counsel claim and; (3) concluding that the substance Wright distributed was crack cocaine. Accordingly, we **AFFIRM** the denial of Wright's § 2255 motion to vacate his sentence.

---

11. Based on the evidence presented in this case, we conclude that even under the more restrictive definition of crack cocaine set forth in Amendment 487, the government met its burden here.