UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose ZACARIA–BARAJAS,
Defendant–Appellant.

No. 02–5267.

United States Court of Appeals,
Sixth Circuit.

Nov. 17, 2003.

---

Dan R. Smith, Asst. U.S. Attorney, U.S. Attorney's Office, Johnson City, TN, for Plaintiff–Appellee.

Charles A. Thomas, Knoxville, TN, for Defendant–Appellant.

Before BOGGS, Chief Circuit Judge; KRUPANSKY and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Defendant appeals his jury conviction for conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846. For the reasons that follow, we AFFIRM the district court's judgment of conviction against Defendant.

## BACKGROUND

Defendant, along with seven co-defendants, was indicted on July 25, 2002 by a federal grand jury in the Eastern District of Tennessee. The indictment contained one count: conspiracy with intent to distribute 500 grams or more of cocaine, contrary to 21 U.S.C. § 846. Defendant pleaded not guilty, but five of his co-defendants plead guilty prior to trial.[1] These co-defendants executed plea and cooperation agreements with the government, pursuant to U.S.S.G. § 5K1.1, making them eligible upon the government's motion for a sentence reduction provided they substantially assisted the government with evidence in the case.

On November 13, 2001, a jury trial commenced against Defendant and the remaining co-defendants, Alejandro Venturo Lopez and Lidia Maldonado. After the

1. The five co-defendants were Rude Verastegui, Javier Sevilla Villegas, Alonso Romano, Gildardo Hernandez, and Jesus Villegas.

presentation of all evidence. but prior to submitting the case to the jury, the district court granted Maldonado's motion for judgment of acquittal, but denied the motions for judgment of acquittal as to Defendant and Lopez. On November 15, 2001, the jury returned guilty verdicts against Defendant and Lopez. On November 26, 2001 Defendant filed a motion to set aside the jury verdict or for a new trial. The district court denied Defendant's motion on January 4, 2002. Defendant subsequently was sentenced to 60 months imprisonment. Defendant filed a timely notice of appeal on February 21, 2001.

## FACTS

In early July 2001, Tennessee Bureau of Investigation special agent Jim Williams, acting in an undercover capacity, negotiated with co-defendant Jesus Villegas, the owner of a Mexican restaurant in Morristown, Tennessee, to purchase two kilograms of cocaine. According to agent Williams' testimony, he spoke with Villegas by telephone on July 12, 2001, at which time they agreed on a price for the cocaine. That evening, agent Williams, accompanied by Drug Task Force agent Maurice Shults, met Villegas and co-defendants Lopez and Javier Sevilla outside of the restaurant (which was closed for business by that time) shortly before midnight. The men entered the restaurant.

After a short wait, Villegas made a telephone call during which he stated that he was waiting for the drugs to arrive. Agent Williams asked Villegas for the cocaine, and Sevilla told him it was on its way and that the person delivering the cocaine was coming from the Panther Creek Park area. After waiting an hour, agent Williams told Villegas that the deal was off, and to call him later if the cocaine arrived. The agents departed the scene and within minutes agent Williams received a call from Villegas informing him that the cocaine had arrived.

When the agents returned to the restaurant, in addition to co-defendants Villegas, Sevilla, and Lopez, three additional persons were present: co-defendants Rude Verastegui and Alonso Roman were in the restaurant, and co-defendant Lidia Maldonado was seated in a car outside. Verastegui and Roman insisted that they be allowed to count the money first. Agent Williams refused. Roman returned to the car with Maldonado and departed, then returned a few minutes later with co-defendant Gildardo Hernandez, who insisted that agent Williams allow Roman to count the money first. Agent Williams consented, and retrieved the money from his truck. After Roman counted the money and was satisfied that the amount was correct, Hernandez instructed Roman to go get the cocaine.

Roman and Maldonado drove away again, and about five to six minutes later they returned to the parking lot, followed by Defendant, who was driving a Honda Accord. Defendant parked near agent Williams' vehicle, and Hernandez told Williams he could go examine the cocaine. Agent Williams testified that as he approached the Honda Accord, he observed Defendant sitting in the driver's seat with two kilograms of cocaine in his lap. Defendant got out of the Accord and, carrying the cocaine close to his side, approached the passenger side of agent Williams' vehicle. Agent Williams opened his car door, and Defendant handed agent Williams the two kilograms of cocaine, which was wrapped in two bricks, approximately six inches by eight inches, and one-and-a-half inches thick, and wrapped in gray duct tape.

At trial, Defendant testified in his own defense. In pertinent part, he testified that he had retired for the evening at his

home in Morristown, Tennessee, when he was awakened by a knock at the door. Defendant answered the door, and a fellow Mexican male informed him that co-defendant Verastegui, a casual acquaintance of Defendant's, needed Defendant to do a small favor in delivering an automobile containing guitars, amplifiers, and stereo equipment to him at a hotel nearby. Defendant initially refused, but a short time later, Verastegui called him up, insisting that Defendant help him out and offering to pay him for his trouble. Defendant relented and drove to the hotel, where Verastegui greeted him and directed him into the parking lot of an adjacent Mexican restaurant. Defendant parked the vehicle, and was approached by Verastegui and another person. Verastegui then asked Defendant to remove something from under the seat for him. Defendant was confused, and Verastegui repeated his request. Defendant did as told and attempted to hand the packages to Verastegui, who then directed him to hand the packages to agent Williams. Defendant handed the packages to agent Williams, who then placed Defendant and the co-defendants under arrest.

During his case-in-chief, Defendant's counsel called to the witness stand the five co-defendants who had pleaded guilty. None of these individuals had been called as government witnesses during the government's case-in-chief. Defense counsel first called Jesus Villegas and asked about his plea agreement. The government objected on relevancy grounds. The district court admitted Villegas' plea agreement as a defense exhibit and permitted Defendant to read the agreement, or portions of the agreement, to the jury at the appropriate time. However, as direct examination of Villegas continued, the district court interceded, asking defense counsel about the plea agreement's relevancy. Defense counsel replied that he wanted the jury to understand that Villegas could have re-ceived a sentence reduction if he had testified against someone else. The district court then ruled that because Villegas had not testified for the government, questions about the plea agreement were improper.

Co-defendant Villegas testified on direct examination that he did not know Defendant, and that his plea agreement required him not to shield anyone who was truly involved in the conspiracy, nor implicate anyone who was not involved. On cross examination, Villegas indicated that he did not know all of his co-defendants; he only knew his brother (Javier Sevilla) and co-defendant Lopez. During re-cross examination, Villegas asserted his innocence in the case, notwithstanding his guilty plea.

Co-defendant Sevilla testified that he knew Defendant as a customer at his restaurant and that none of the defendants on trial, i.e., Defendant, Maldonado, and Lopez, were involved in cocaine distribution. Sevilla also proclaimed his innocence as to the present drug deal. On cross examination, he said he knew nothing about his brother's (i.e., Jesus Villegas's) intent to distribute cocaine at the restaurant.

Co-defendant Roman testified that he only knew his wife, co-defendant Maldonado, and that she had accompanied him that evening because he had been too intoxicated to drive himself. He further testified that neither he nor his wife had known that they were participating in a cocaine deal.

Co-defendant Hernandez also testified that he had not met Defendant prior to the night of his arrest. He professed innocence, claiming that he had been present as an interpreter on the evening in question and had no idea that a cocaine transaction was taking place until he arrived at the restaurant. He explained that he had pleaded guilty because his attorney tricked him.

Verastegui testified that he barely knew Defendant, identifying one occasion when Defendant had given him a ride in his car. He testified that on the night in question he had been telephoned by one of the owners of the Mexican restaurant, who was looking for drugs to purchase. Verastegui stated that he had acted as the middle-man in the drug deal in exchange for $1000.00. He also testified that he had agreed to admit his guilt, but had not agreed to cooperate with the government. After the presentation of evidence and prior to submitting the case to the jury, Defendant and his two co-defendants moved for judgments of acquittal. The district court granted co-defendant Maldonado's motion, but denied Defendant's and Lopez's motions. Prior to closing arguments, the district court informed the jury that it had granted Maldonado's motion:

> Court: Okay. Ladies and Gentlemen of the jury, I've dismissed one of these cases, her name was—who is it, Mr. Clerk?
>
> Clerk: It's Lidia Maldonado.
>
> Court: Yeah, the lady over here. I dismissed her myself; and the trial is going on as to the charges against the two, and that's the only ones we'll have.

(J.A. at 395.) Subsequently, after closing arguments, the district court delivered its charge to the jury, at which time it cautioned the jury of its duty to "separately consider the evidence against each defendant and return a separate verdict for each one. Your decision as to one defendant should not influence your decision as to the other defendant." (J.A. at 110.)

The jury subsequently returned guilty verdicts against Defendant and co-defendant Lopez. Defendant then filed this appeal.

## DISCUSSION

### A.

■ Defendant first argues that the government presented insufficient evidence with respect to his intent, knowledge of, and agreement to enter into a criminal conspiracy with the other co-defendants. Specifically, Defendant points out the lack of testimony, or other corroborative evidence, indicating that Defendant had entered into an agreement with the others.

*Standard of Review*

This Court reviews a challenge to sufficiency of evidence to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Kincaide,* 145 F.3d 771, 781 (6th Cir.1998) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

We have stated that "[t]he essential elements of conspiracy under 21 U.S.C. § 846 are (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator." *United States v. Maliszewski,* 161 F.3d 992, 1006 (6th Cir.1998) (quoting *United States v. Elder,* 90 F.3d 1110, 1120 (6th Cir.1996)). Thus, it is true that "[a]n essential part of any conspiracy conviction is a showing that a particular defendant knew of and adopted the conspiracy's main objective." *United States v. Bibby,* 752 F.2d 1116, 1124 (6th Cir. 1985) (citing *United States v. Smith,* 700 F.2d 627, 632 (11th Cir.1983)).

As the government correctly observes, however, it was not necessary for the government to produce evidence of an actual agreement, or Defendant's assent to the agreement, so long as sufficient evidence

had been presented permitting a jury to infer the existence of a conspiracy. *Maliszewski*, 161 F.3d at 1006 ("Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances.") (citation and internal quotation marks omitted). Indeed, "[o]nce the existence of a conspiracy is shown, only slight evidence is necessary to connect a defendant with it." *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir.1996) (internal citations omitted). Similarly, knowledge and intent can also be presumed based upon possession or control of drugs. *See United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998). Of course, the evidence connecting a defendant to a conspiracy need only be slight, but "[t]he existence of a connection for a conspiracy must be shown beyond a reasonable doubt." *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir.1988); *see also United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (reasoning evidence connecting defendant to conspiracy was proven beyond a reasonable doubt).

In this case, testimony from agent Williams indicated that after involved discussions with co-defendant Hernandez, he met Hernandez at the restaurant, where the co-defendants were present as they counted the money, and awaited arrival of the drugs. The government presented evidence connecting Defendant to the conspiracy. Specifically, Williams' testimony indicated that Defendant followed the vehicle driven by co-defendants Roman and

Maldonado into the parking lot of the Mexican restaurant. Defendant parked his car next to agent Williams' car, the only spot in the parking lot where his activities would be concealed from passersby on the street, a possible indication of his intent. As agent Williams approached the vehicle, he saw the cocaine package on Defendant's lap. Defendant then exited his vehicle, holding the package close to his side, and handed the package to agent Williams. We agree with the government that Defendant's presence and active participation[2] at the drug transaction provides sufficient evidence for a reasonable jury to infer Defendant's guilt as to all elements of 21 U.S.C. § 846.

Defendant points to the testimony of five co-defendants, none of whom implicated Defendant as having been involved in the drug conspiracy in any respect.[3] Defendant insists that such testimony should be considered particularly credible given that they had taken plea agreements allowing for a possible 5K1.1 sentence reduction if they had testified against him. Yet what Defendant is essentially arguing is that the jury should have credited the co-defendants' testimony. "[D]etermining the credibility of witnesses is a task for the jury, not this court." *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir.2000) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir.1993)). A jury is entitled to accept or reject testimony. *Id.* In particular, four of the co-defendants proclaimed their innocence. These proclama-

---

2. Certainly Defendant was not just a bystander, which would not have provided sufficient evidence for a § 846 conviction. *Cf. United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir.1994) (holding that "[m]ere presence at the crime scene is insufficient' " to prove participation in a drug conspiracy).

3. Actually, three of the five co-defendants testified that they had never met Defendant prior to the night of the drug transaction and their

subsequent arrest, and the other two testified that they barely knew Defendant. But a defendant need not know all of his or her co-conspirators in order to be convicted on a conspiracy charge. *Maliszewski*, 161 F.3d at 1006 ("Once the conspiracy itself has been proven to exist, it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise").

tions directly conflicted with agent Williams' testimony of detailed negotiations with Hernandez, as well as the co-defendants' guilty pleas. The jury apparently credited the testimony of agent Williams over the testimony of the purportedly innocent co-defendants. Similarly, the jury apparently rejected the testimony of Defendant that he was asked, as a favor, to deliver an automobile containing musical equipment to Verastegui. This was within the jury's discretion. We agree with Defendant that the evidence against him is not overwhelming. Nevertheless, the evidence was sufficient to support Defendant's 21 U.S.C. § 846 conviction. We conclude therefore that the district court did not err in denying Defendant's motion for a judgment of acquittal because sufficient evidence presented at trial supported his conviction.

### B.

■ We now turn to Defendant's argument that the district court abused its discretion by refusing to let his counsel read into the record the plea and cooperation agreements of the five co-defendants.

### Standard of Review

A district court's evidentiary ruling is reviewed under an abuse of discretion standard. *United States v. Talley*, 194 F.3d 758, 765 (6th Cir.1999). "An abuse of discretion occurs when we are left with the 'definite and firm conviction that the [district] court ... committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' or 'where it improperly applies the law or uses an erroneous legal standard.'" *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir.2002) (*citing Huey v. Stine*, 230 F.3d 226, 228 (6th Cir.2000)).

This is admittedly a close issue, but we believe any error committed by the district court was harmless. The five co-defendants were called to the witness stand by

Defendant and testified that he had not been involved in the conspiracy. The district court, with respect to the first co-defendant. Villegas, initially allowed questioning about Villegas' plea agreement, but then determined that discussion of the plea agreement was inappropriate since the government had not called the co-defendants to the stand in their case-in-chief. The court thereafter disallowed questioning as to the plea agreement. Defendant argues that the plea agreement information was relevant evidence in that it tended to support the credibility of the co-defendants' testimony, inasmuch as, despite their incentive to earn a 5K1.1 sentence reduction by testifying against Defendant, they testified as to his innocence.

We agree with Defendant that the plea agreement information was relevant evidence, but we believe its exclusion by the district court was harmless. In the typical scenario, the issue is whether the government improperly introduced plea agreements against a defendant. Regardless, evidentiary rules prohibit a party from bolstering the credibility of his or her own witness until that credibility has first been attacked by the opposing party. Fed. R.Evid. 608(b). Introduction of evidence for the specific purpose of bolstering the witness' credibility is usually not a valid reason for admitting the evidence. We therefore believe that, despite the relevancy of the plea agreements to Defendant's case, the district court did not abuse its discretion in excluding this evidence pursuant to the Federal Rules of Evidence.

### C.

■ The final issue presented for our study concerns the district court's statement to the jury that it dismissed the charges against co-defendant Maldonado and that "the trial is going on as to the

charges against [Defendant and co-defendant Lopez]." (J.A. at 395).

### Standard of Review

Because Defendant did not object to the district court's statement to the jury, we will review for plain error only. *United States v. Cleaves,* 299 F.3d 564, 567 (6th Cir.2002). "Plain error review is narrow in scope, involving (1) an error (2) that is plain and (3) that affects the defendant's substantial rights." *Id.* at 567–68 (6th Cir. 2002) (citations omitted). This Court will reverse on the basis of plain error only if it " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (citing *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

After dismissing Maldonado, the district court reminded the jury, as part of the jury charge, to consider the evidence of each co-defendant individually in deciding whether to convict or acquit. Defendant argues that the district court's statement to the jury amounted to unfair prejudice because it suggested to the jury that the court believed that Maldonado was innocent but Defendant was guilty.

We disagree with Defendant that he suffered unfair prejudice because of the district court's open dismissal of Maldonado. It was necessary for the district court to explain to the jury what happened to Maldonado's case, and to clarify which cases remained for the jury to decide. *Maliszewski,* 161 F.3d at 1004. We have stated that in informing the jury of the dismissal of a co-defendant, "it is not necessary to give a detailed explanation, and it is appropriate for the court to instruct that the change should be of 'no concern' to the jury." *Id.* In the present case, the district court provided the jury with only a short explanation about Maldonado's dismissal, and although it did not explicitly caution the jury not to let the new development affect its deliberations in any regard, it did instruct the jury to consider the evidence against each co-defendant separately. We perceive no error in this instruction.

### CONCLUSION

For the reasons stated above, we AFFIRM the district court's conviction of Defendant.